IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Cause No. CR-19-45-GF-BMM |
| Plaintiff, | |
| vs. | ORDER |
| MYCHAL THOMAS DAMON, | |
| Defendant. | |

A Grand Jury indicted Defendant Mychal Thomas Damon on one count of Abusive Sexual Contact, in violation of 18 U.S.C. §§ 1153(a) and 2244(a)(5). (Doc. 1.) Damon filed a Motion to Suppress Statements on August 12, 2019. (Doc. 22.) The Government opposes the motion. (Doc. 35.) The Court held a hearing on Damon's motion on September 16, 2019. (Doc. 44.)

**BACKGROUND**

Law enforcement responded to the hospital on the Fort Peck Indian Reservation after a mother reported that she suspected that her daughter, Jane Doe, had been sexually abused. (Doc. 35 at 2.) Jane Doe underwent a forensic interview and indicated that Damon had touched her vagina. (*Id.*)

Damon met FBI Special Agents David Burns and Burke Lanthorn (SA Burns and SA Lanthorn) in the FBI office in Glasgow, Montana on January 26, 2019. (Doc. 23 at 1.) During an hour-long interrogation, Damon admitted to holding the victim, but not to touching her inappropriately. (*Id.*) Damon reported during this interview that Jane Doe and her mother had stayed at Damon's house because they had locked themselves out of their house. (Doc. 35 at 3.) Doe got up from the couch during the night and was cold and Damon allowed her to sit on his lap. (*Id.*) Doe's mother woke up in the middle of the night and took Doe from Damon. (*Id.*) Damon agreed to return to the FBI office at a later date to submit to a polygraph examination. (Doc. 23 at 2.)

Damon returned to the FBI office in Glasgow on March 13, 2019, for the polygraph examination. (*Id.*) Special Agent Stacey Smiedala (SA Smiedala) was present, along with SA Burns and SA Lanthorn. (*Id.*) SA Burns and SA Lanthorn left the interview room. SA Smiedala conducted the pre-polygraph interview beginning at 9:15 a.m. (Doc. 35 at 4.)

SA Smiedala presented an Advice of Rights Form and a Consent to Interview with Polygraph Form to Damon. Damon signed both forms. (Doc. 24 at 6-7.) SA Smiedala did not record his discussion with Damon. (Doc. 23 at 2.) SA Burns and SA Lanthorn observed the interview from a different room through a video monitor, but could not hear any of the discussion. (Doc. 35 at 4.) Damon admitted to touching Doe inappropriately at some point during his discussion with SA Smiedala. SA Smiedala informed SA Burns and SA Lanthorn.

SA Burns joined Damon and SA Smiedala in the conference room. The agents then conducted a summary recording of Damon's statement at about 9:58 a.m. (Doc. 35 at 5-6.) The summary recording reflects Damon's admission for the first time that he touched Doe's vagina while they were seated on the recliner. Damon acknowledged in the recording that he was treated fairly and had not been forced to make any statement.

Damon now requests that the Court suppress his statements. Damon argues that the statements had not been voluntary. Damon argues that SA Smiedala's failure to record the pre-polygraph interview leaves no way to know what happened during the pre-polygraph interview. (Doc. 23 5-6.) Damon argues that admission of only the recorded portion of the discussion will violate his due process rights. (*Id.*)

## DISCUSSION

Involuntary statements violate a defendant's right to due process. *United States v. Miller*, 984 F.2d 1028, 1030 (9th Cir. 1993). Physical and psychological pressure may lead to an involuntary confession. *Miller*, 984 F.2d at 1030. The government has the burden to prove by a preponderance of the evidence the voluntariness of a defendant's confession. *Lego v. Twomey*, 404 U.S. 477, 489 (1972). A statement is voluntary if it is "the product of a rational intellect and a free will." *Medeiros v. Shimoda*, 889 F.2d 819, 823 (9th Cir. 1989). A court looks to the totality of the circumstances when analyzing the admissibility of a defendant's statements. *Withrow v. Williams*, 507 U.S. 680, 689 (1993).

Courts consider whether the government obtained a confession by physical or psychological coercion or by improper inducement so as to overbear the suspect's will. *United States v. Leon Guerrero*, 847 F.2d 1363, 1366 (9th Cir. 1988). Courts evaluate various factors in determining whether a person had provided a statement voluntarily: the suspect's age and intelligence; whether law enforcement advised the suspect of his constitutional rights; how long law enforcement detained the suspect; whether the questioning was prolonged and repeated; and whether law enforcement used physical punishment such as the deprivation of food or sleep. *United States v. Haswood*, 350 F.3d 1024, 1027 (9th Cir. 2003).

Law enforcement officers may confront suspects with evidence, appeal to defendants' emotions, and even provide false or misleading information. *See, e.g.*, *Fracier v. Cupp*, 394 U.S. 731, 737-39 (1969); *Ortiz v. Uribe*, 671 F.3d 863, 870-72 (9th Cir. 2011); *United States v. Moreno-Flores*, 33 F.3d 1164, 1168-70 (9th Cir. 1994). A confession proves voluntary as long as it remains the "product of the suspect's own balancing of competing considerations." *Miller*, 984 F.2d at 1031.

The Ninth Circuit in *United States v. Haswood*, 350 F.3d 1024 (9th Cir. 2003), considered the voluntariness of a suspect's confession to an FBI agent after having undergone an unrecorded polygraph examination. The suspect in *Haswood* agreed to take a polygraph examination and signed the standard FBI Advice of Rights Form and Consent to Polygraph Form at the beginning of the examination. *Haswood*, 350 F.3d at 1026. The FBI agent administered the polygraph examination.

After the examination, the FBI agent showed a newspaper article to Haswood about a different child abuse case. The suspect in the other case initially had lied to the FBI agent. *Id.* A court ultimately sentenced the suspect in the other case for both child abuse and having made false statements. Haswood subsequently admitted to having touched the victim on three occasions. The FBI agent and Haswood went over Haswood's statement. The FBI agent asked Haswood to write a statement as soon as they both "felt comfortable." *Id.* The FBI agent did not

5

record any portion of the interaction. Haswood moved to suppress the statements. *Id.* at 1027.

The FBI agent testified that FBI policy prohibited him from recording the polygraph examination. *Id.* at 1028. The district court disagreed after having examined the FBI Policy Manual. The district court concluded that the policy did not affirmatively prohibit an agent from recording a polygraph examination. The district court suppressed Haswood's statements due to the coercive nature of showing Haswood the newspaper article. *Id.*

The Ninth Circuit reversed. *Id.* at 1029. The Ninth Circuit concluded that, even if it accepted the district court's underlying findings and inferences about what occurred during the unrecorded polygraph examination, the record still lacked any evidence of coercion. *Id.; see also United States v. Red Star*, 2007 WL 2051235 (9th Cir. 2007). The Ninth Circuit summarized the facts as follows:

> [A]n FBI agent drove Haswood to the examination, where another agent subjected him to a daylong interrogation. During this time, Haswood denied having molested the young girl. Once the agent concluded the polygraph examination, he accused Haswood of being untruthful during the exam. The agent then presented Haswood with a newspaper article that illustrated the possible consequences of lying. Haswood verbally confessed. [The FBI agent] subsequently influenced which words Haswood used in his written confession.

*Haswood*, 350 F.3d at 1029. Nothing in the record suggested that the FBI Agent's failure to record the interview had influenced Haswood's admission. *Id.* at 1028-

29. The Ninth Circuit specifically noted that the "use of polygraph results is a reasonable means of police questioning." *Id.* at 1028.

Courts have identified significant concerns regarding partial recordings. *See State v. Barnett*, 789 A.2d 629 (N.H. 2002); *State v. Scales*, 518 N.W.2d 587 (Minn. 1994); *Stephan v. State*, 711 P.2d 1156 (Alaska 1985). The New Hampshire Supreme Court in *Barnett* determined that a taped recording of an interrogation that occurred after law enforcement had provided *Miranda* rights would be admissible only if it represented a complete recording of the interrogation. *Barnett*, 789 A.2d at 632. The court noted that the danger of allowing a recorded confession into evidence. The defendant's statements, in his or her own voice, have "a persuasive power unrivaled by contradictory testimonial evidence." *Barnett*, 789 A.2d at 632-33.

The Alaska Supreme Court in *Stephan* examined a situation in which law enforcement only partially recorded the interrogations of two defendants. *Stephan*, 711 P.2d at 1158. The court excluded the partial recordings based on law enforcement's "arbitrary failure" to record the entire conversation that directly affected the defendant's ability to present his defense. *Stephan*, 711 P.2d at 1164. The Minnesota Supreme Court in *Scales* required that law enforcement should record all custodial interrogations when feasible. *Scales*, 518 N.W.2d at 592. The court recognized that a "recording requirement . . . discourages unfair and

psychologically coercive police tactics and thus results in more professional law enforcement." *Scales*, 518 N.W.2d at 591.

Montana law, although not specifically applicable here, requires law enforcement officers to record custodial interviews in their entirety, subject to a few exceptions. Mont. Code Ann. § 46-4-408. "The recording must contain a peace officer advising the person being interviewed of the person's Miranda rights, a recording of the interview, and a conclusion of the interview." *Id.* The Montana Supreme Court "views with distrust" a law enforcement officer's failure to record a non-custodial interview if the interview took place in a controlled situation absent exigent circumstances. *See State v. Deines*, 208 P.3d 857, 860-863 (Mont. 2009) (discussing cases).

The Montana Supreme Court has applied this "views with distrust" notion in a variety of contexts. These contexts include the following scenarios: a law enforcement officer's failure to record *Miranda* warnings advising a suspect of his rights, *State v. Grey*, 907 P.2d 951, 956 (Mont. 1995); failure to videotape the results of a thermal imaging scan used to support a search warrant application for a suspected marijuana grow operation, *State v. Siegal*, 934 P.2d 176, 192-93 (Mont. 1997), *overruled on other grounds by State v. Kuneff*, 970 P.2d 556 (Mont. 1998); failure to record an interview with child sexual abuse victims, *State v. Weaver*, 964 P.2d 713, 723 (Mont. 1998); and failure to record a citizen informant's statements

in the controlled environment of a station house, *State v. Worrall*, 976 P.2d 968, 978 (Mont. 1999). The Montana Supreme Court has questioned the veracity of statements even more when the investigating officer makes a conscious decision not to videotape or audiotape interviews or to preserve any other kind of record of the interviews. *Weaver*, 964 P.2d at 723.

The Court further recognizes that the Ninth Circuit generally prohibits the admissibility of a polygraph examination at trial. *United States v. Bowen*, 857 F.2d 1337, 1341 (9th Cir. 1988). Polygraph evidence presents an "overwhelming potential for prejudice" because of its "questionable reliability and its misleading appearance of accuracy." *United States v. Miller*, 874 F.2d 1255, 1261 (9th Cir. 1989).

SA Smiedala repeatedly has obtained confessions during unrecorded polygraph interviews. SA Smiedala has employed nearly identical interview procedures to obtain confessions in numerous other Montana cases. *See, e.g.*, *United States v. Birdrattler*, CR 19-57-GF-BMM; *United States v. Graham*, CR 13-37-M-DWM; *United States v. Deputee*, CR 07-64-BLG-RFC; *United States v. Davis*, CR 13-28-GF-DLC. SA Smiedala interviewed the defendant in *Deputee* for an hour and a half during a pre-polygraph interview, obtained a confession from the defendant, and then recorded the last five minutes of the interview as a "summary of statements made." (*Deputee*, CR 07-64-BLG-RFC, Doc. 57.) SA

Smiedala used similar interview techniques in *Birdrattler*, *Graham*, and *Davis*. SA Smiedala did not perform a polygraph test in *Birdrattler*, *Graham*, or *Davis*. SA Smiedala did not perform a polygraph test here. SA Smiedala testified that FBI policy prohibits him from recording polygraph examinations, including pre-polygraph interviews. (Doc. 35 at 29-30.) The Government maintains that SA Smiedala's interview procedures comply with the FBI's policy regarding polygraph examinations.

At the conclusion of the hearing on the motion to suppress, the Court directed the Government to submit documentation regarding the FBI Policy and the policy of the United States Attorney's Office on the recording of interviews. (Doc. 44.) The United States Department of Justice issued a memorandum outlining its policy that creates a presumption in favor of recording custodial statements of individuals. (Doc. 50-1.) The memorandum provides limited exceptions to the presumption, including for public safety and national security. (*Id.* at 3.) The public safety exception typically involves a scenario where a defendant's actions, such as discarding a weapon in a crowded supermarket, present an immediate safety concern to the general public or the arresting officer. *New York v. Quarles*, 467 U.S. 649, 655-56 (1984); *see also United States v. Williams*, 842 F.3d 1143, 1149-50 (9th Cir. 21016) (declining to extend public safety exception to questioning of a defendant in custody of his gang affiliations).

The United States submitted the District of Montana 2019 Indian Country Law Enforcement Initiative Operational Plan ("Operational Plan"). The Operational Plan creates guidelines for the investigation of crimes in Indian Country. The Operational Plan explicitly references and adopts the "presumption in favor of electronically recording custodial interviews, with certain exceptions, and encourages agents and prosecutors to consider taping outside of custodial interrogations." (Doc. 50-3.)

The United States also submitted a declaration from Josefina Regula, the Acting Unit Chief of the Polygraph Unit of the FBI. (Doc. 50-3.) According to Regula's declaration, "noncustodial polygraph examinations may not be audiotaped or videotaped without the approval of both the Unit Chief of the Polygraph Unit and the Special Agent in Charge of the FBI Field Office where the examination occurs." (Doc. 50-3 at 2.) Regula justified the need for the policy based on her characterization of the polygraph exam as a "sensitive investigative technique." (Doc. 50-3 at 2.)

The FBI's use of a polygraph examination appears to serve primarily as a coercive tactic and a justification to avoid having to record interviews. There appears to be little intention by the FBI actually to administer the polygraph examination in these interviews. The fact that any results from a polygraph

examination almost certainly would be inadmissible as evidence to establish the truth of any statement supports this conclusion. *See Bowen*, 857 F.3d at 1341.

The Court also remains skeptical that few cases that arise in Indian Country present "public safety" or "national security" concerns that otherwise would justify the failure to record these interviews. (Doc. 50-1); *see also Quarles*, 467 U.S. at 655-56. The FBI investigated alleged crimes of sexual abuse in both *Birdrattler* and *Damon*. The documents submitted by the Government and testimony provided by its witnesses attempt to cast the pre-test phase as both a routine, information gathering interview and a "protected investigative tool." (Doc. 50-3.) It cannot be both.

Based on the record, the Court is unable to conclude that Damon's statements to SA Smiedala were involuntary. The Court considered the following factors in arriving at this conclusion: Damon's age and intelligence; whether SA Smiedala advised Damon of his constitutional rights; how long SA Smiedala detained Damon; whether the questioning had been prolonged and repeated; and whether SA Smiedala used physical punishment such as the deprivation of food or sleep. *See Haswood*, 350 F.3d at 1027.

Damon graduated from high school and obtained three years of college-level education. (Doc. 35 at 4.) Damon had worked previously as a patrolman for the Fort Peck Tribal Police Department and had served in the Army Reserve. (Doc. 35

at 5.) Damon signed the Advice of Rights Form and the Consent to Interview with Polygraph Form. (Doc. 24 at 6-7.) The interview began around 9:15 a.m. and concluded at 10:05 a.m. (Doc. 24 at 4.) The questioning lasted for less than an hour. This duration cannot be described as prolonged and repeated. *Cf. Haswood*, 350 F.3d at 1029. Nothing in the record suggests that SA Smiedala used any sort of physical punishment. The evidence does not demonstrate that the FBI obtained Damon's confession by means of physical or psychological coercion or by improper inducement so as to overbear Damon's will. *See Leon Guerrero*, 847 F.2d at 1366.

Similar to *Haswood*, the record contains insufficient facts to establish that Damon's statement had been involuntary. Obviously the record does not contain potential contested facts due to the failure to record all except the summary statement. SA Smiedala's failure to record the pre-polygraph interview, however, absent any other evidence of coercion, does not demonstrate that SA Smiedala obtained Damon's confession by physical or psychological coercion or by improper inducement so as to overbear Damon's will. *Haswood*, 350 F.3d at 1029.

The reliability of Damon's voluntary statements remains suspect, however, due to the fact that SA Smiedala did not record the pre-polygraph interview and then recorded only a summary confession statement. This scenario left SA Smiedala in a position potentially to shape Damon's recorded interview statements

during the unrecorded pre-polygraph interview. SA Smiedala's interview procedure, as used here and in numerous similar cases, generally will not result in involuntary or coerced statements. *See Haswood*, 350 F. 3d at 1028-029. SA Smiedala's interview procedure instead allows the Government to shape its presentation of the defendant's statements at trial. *See Graham*, CR 13-37-DWM, Doc. 128 at 13. SA Smiedala's interview procedure affects the reliability and fairness of presenting the recorded "summary" statements to the jury. *Id.*

The Government controls the interrogation process. Courts have offered cautionary instructions to ensure the fair presentation of evidence in similar situations. *See, e.g.*, *United States v. Azure*, 1999 WL 33218402 at *2 (D.S.D. 1999); *Massachusetts v. DiGiambattista*, 813 N.E.2d 516 (Mass. 2004). The Massachusetts Supreme Court in *DiGiambattista* reasoned that a specific cautionary instruction may be appropriate where "there are grounds for questioning the reliability of certain types of evidence that the jury might misconstrue as particularly reliable." *DiGiambattista*, 813 N.E.2d at 533. The court noted that a fact finder can evaluate an interrogation's precise contents and any alleged coercive influences only from a complete recording of the entire interrogation. *Id.* at 532. A cautionary instruction would be appropriate in situations where a partial recording exists. The court specifically noted that the existence of only a partial

recording often may be attributed to the strategic decisions of the interrogating officer. *Id.* at 533.

The Ninth Circuit has recognized that a district court may "support any disbelief it has" of a witness's testimony by "noting the lack of a recording." *United States v. Wright*, 625 F.3d 583, 604 n.10 (9th Cir. 2010), *superseded by statute on other grounds as stated in United States v. Brown*, 785 F.3d 1337, 1351 (9th Cir. 2010). The FBI's failure to record interviews when possible may support the fact finder's inference that the agent did not portray accurately the interrogation's circumstances. *Id.* (citing *United States v. Yunis*, 859 F.2d 953, 961 (D.C. Cir. 1988)). The district court also may consider the FBI's adopted policy of not recording interviews preceding a polygraph examination. *Id.*

The totality of the circumstances likely will support a cautionary instruction in this case. *DiGiambattista*, 813 N.E.2d at 533. SA Smiedala had available to him the technology to record the pre-polygraph interview, but he chose not to record it. Should the Government play the recorded portion of the interview or present testimony about the unrecorded portion of the interview at trial, the Court will instruct the jury to weigh that evidence with great caution. The Court further will instruct the jury that if they find the FBI could have recorded the interview—but chose not to record—the jury should "view with distrust" the recording and the testimony. *Deines*, 208 P.3d at 860-863.

The Court again notes its concern with the interview procedures used in this case, in *Birdrattler*, and in others. The use of an unrecorded pre-polygraph interview as a coercive tactic and justification for the failure to record the interview conflicts with the policy issued by the United States Department of Justice and the District of Montana's Operational Plan on recording interviews in Indian Country. The Court appreciates the potential national security concerns that could arise from the recording of FBI polygraph examinations. (No. 19-45 Doc. 50-1.) The interview of suspects in investigations for crimes committed in Indian Country typically, however, do not involve alleged terrorism or threats to public safety of the type identified in *Quarles*. The cases cited in this order prove the point. *United States v. Birdrattler*, CR 19-57-GF-BMM; *United States v. Graham*, CR 13-37-M-DWM; *United States v. Deputee*, CR 07-64-BLG-RFC; *United States v. Davis*, CR 13-28-GF-DLC.

The Government has chosen to use the tool of a threatened polygraph examination to attempt to extract confessions from defendants. The Government cannot choose to use this "sensitive investigative technique" in cases that lack apparent national security or public safety concerns and avoid scrutiny. (Doc. 50-3 at 2.) This scrutiny includes questions regarding the need for the use of this practice in these types of cases. Some may argue that the ends justify the means as evidenced by the statements obtained. In a free and democratic society, however,

16

how we discover the truth matters as much as the truth that we discover. "For jurors to see as well as hear the events surrounding an alleged confession or incriminating statement is a forward step in the search for truth." *Hendricks v. Swenson*, 456 F.2d 503, 507 (8th Cir. 1972).

## ORDER

Accordingly, **IT IS ORDERED** that Damon's Motion to Suppress (Doc. 22) is **DENIED**.

DATED this 12th day of November, 2019.

_____
Brian Morris
United States District Court Judge